**Lewis R. Landau (CA Bar No. 143391)**
**Attorney-at-Law**
23564 Calabasas Road, Suite 104
Calabasas, California 91302
Voice and Fax: (888) 822-4340

Attorney for Alan Jay Baron, Debtor

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>Alan Jay Baron,<br><br>        Debtor. | Case No.: 1:08-16222 KT<br><br>Adversary No.:<br><br>Chapter 13<br><br>**COMPLAINT FOR:** |
| Alan Jay Baron,<br><br>        Plaintiff,<br><br>vs.<br><br>U.S. Bank National Association, as Trustee, for the Benefit of Harborview 2005-16 Trust Fund; ReconTrust Company, N.A.; Mortgage Electronic Registration Systems, Inc.,<br><br>        Defendants. | **1.     DECLARATORY RELIEF;**<br>**2.     QUIET TITLE;**<br>**3.     WRONGFUL FORECLOSURE;**<br>**4.     BREACH OF FIDUCIARY DUTY; AND**<br>**5.     ATTORNEY'S FEES**<br><br>Status Conference:<br>Date:  To be set<br>Time:  To be set<br>Crtm:  301 |

Alan Jay Baron, Chapter 13 Debtor ("Debtor") alleges and complains against U.S. Bank National Association, as Trustee, for the Benefit of Harborview 2005-16 Trust Fund ("US Bank"); ReconTrust Company, N.A. ("ReconTrust"); Mortgage Electronic Registration Systems, Inc. ("MERS"), (collectively "Defendants") as follows:

### STATEMENT OF PARTIES, JURISDICTION AND VENUE

1. This action is a civil proceeding arising in the above captioned Debtor's chapter 13 bankruptcy case, which is now pending in this judicial district, and arising under, arising in and related to Title 11 United States Code. This Court has jurisdiction pursuant to 28

U.S.C. § 1334(b) and 28 U.S.C. § 157 (b)(2)(A), (E), (K) and (O) to hear and determine this proceeding and to enter an appropriate final order and judgment. Accordingly, this adversary proceeding is a core proceeding.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3. The Debtor commenced its bankruptcy case by filing a voluntary chapter 13 petition on August 22, 2008.

4. US Bank is an entity of unknown status having previously appeared in this case by filing documents identified as case docket numbers 14, 15 and 22 consisting of a motion for relief from stay and an opposition to the Debtor's motion to impose a stay.

5. ReconTrust is an entity of unknown status. According to its website located at www.recontrustco.com/about_us.aspx, ReconTrust is a member of the Countrywide family of companies. Countrywide Financial Corporation is a Delaware corporation whose principal address is 4500 Park Granada, Calabasas, California 91302. ReconTrust was the foreclosure trustee under the deed of trust identified in paragraph 8 below during all times relevant to this Complaint.

6. MERS is California corporation whose principal address is 2216 16th Street, Sacramento, California 95818. As described in the below identified opinion, Mortgage Electronic Registration Systems, Inc., or "MERS" "is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS. MERS may be listed as the grantee in the official records maintained at county register of deeds offices. The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members." Mortg. Elec. Registration Sys. v. Nebraska Dept. of Banking & Fin., 270 Neb. 529, 530, 704 N.W.2d 784 (2005).

**COMMON ALLEGATIONS**

7. Paragraphs 1 through 6 are incorporated herein by reference as if fully set forth hereat.

8. On October 27, 2005, Debtor executed an Adjustable Rate Note ("Note") in favor of Countrywide Home Loans, Inc. ("CHL") in the principal amount of $1,910,000. A true and correct copy of the Note is attached hereto as Exhibit 1.

9. On October 27, 2005, Debtor executed a Deed of Trust ("DOT") on real property owned by the Debtor located at 29711 Harvester Road, Malibu, California 90265 ("Residence") to secure the Note. A true and correct copy of the DOT is attached hereto as Exhibit 2. The legal description of the Residence is attached to Exhibit 2.

10. As set forth in Exhibit 2, the Debtor granted the DOT to MERS as beneficiary "(solely as nominee of Lender and Lender's successors and assigns) and the successors and assigns of MERS." In the DOT, "Lender" is defined as CHL.

11. Debtor is informed and believes that at some time prior to February 27, 2007, CHL assigned its beneficial interest in the Note and DOT to US Bank.

12. On February 28, 2007, ReconTrust in its capacity as foreclosure trustee under the DOT recorded a Notice of Default ("NOD") under the DOT and purportedly under California mortgage foreclosure law. A true and correct copy of the NOD is attached hereto as Exhibit 3.

13. On March 3, 2008, ReconTrust in its capacity as foreclosure trustee under the DOT recorded a Notice of Trustee's Sale ("NOS") under the DOT and purportedly under California mortgage foreclosure law. A true and correct copy of the NOS is attached hereto as Exhibit 4.

14. On April 4, 2008, ReconTrust in its capacity as foreclosure trustee under the DOT conducted a non-judicial foreclosure sale of the Debtor's Residence. US Bank bid $2,040,000 at the sale and being the high bidder at the sale became the purchaser thereof for the bid amount ("Foreclosure Sale")

15. On April 16, 2008, MERS recorded a "Corporation Assignment and Deed of Trust" Los Angeles County Recorder document number 20080655594 ("Assignment") purporting to

transfer its beneficial interest under the DOT to US Bank.  The Assignment bears an original date of February 27, 2007 (the day before the NOD was recorded) yet was executed on April 11, 2008, after the April 4, 2008 foreclosure sale.  A true and correct copy of the Assignment is attached hereto as Exhibit 5.

16. On April 16, 2008, ReconTrust recorded a "Trustee's Deed Upon Sale" Los Angeles County Recorder document number 200806555945 ("Trustee's Deed") purporting to evidence the transfer of title in the Debtor's Residence to US Bank.  A true and correct copy of the Trustee's Deed is attached hereto as Exhibit 6.

17. The Debtor is informed and believes that at the time of recording the NOD, NOS and Foreclosure Sale, neither CHL nor MERS were the beneficial owner of any interest in the Note and DOT.

18. The Debtor is informed and believes that at the time of recording the NOD, NOS and Foreclosure Sale, US Bank was the beneficial owner of any interest in the Note and DOT.

**FIRST CAUSE OF ACTION**

**DECLARATORY RELIEF**

**(Against all Defendants)**

19. Paragraphs 1 through 18 are incorporated herein by reference as if fully set forth herein.

20. Pursuant to California Civil Code § 2932.5:

> Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. ***The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded.*** (emphasis added)

21. Neither CHL nor MERS held a power of sale under the DOT at the time that ReconTrust recorded the NOD, NOS or conducted the Foreclosure Sale because the Debtor is informed and believes that neither CHL nor MERS was a beneficial owner of the Note or DOT as of February 27, 2007.

22. The Debtor is informed and believes that the Defendants executed and recorded the Assignment after the Foreclosure Sale as a sham attempt to feign compliance with California foreclosure law.

23. Based on the foregoing, an actual dispute and controversy exists among the Debtor, MERS, ReconTrust and US Bank concerning the validity of the Foreclosure Sale. A judicial declaration of the parties' rights is necessary to determine their interest in the Debtor's Residence.

## SECOND CAUSE OF ACTION

### QUIET TITLE

#### (Against all Defendants)

24. Paragraphs 1 through 23 are incorporated herein by reference as if fully set forth hereat.

25. Debtor claims that the Foreclosure Sale is void *ab initio* and that his interest in the Residence continues unabated.

26. To the extent that the Foreclosure Sale is declared invalid, Debtor requests that the Court order the Trustee's Deed void and of no force and effect and quiet title to the Residence in the Debtor as of the Foreclosure Sale.

27. Debtor prays for a determination of his title in and to the Residence.

## THIRD CAUSE OF ACTION

### WRONGFUL FORECLOSURE

#### (Against all Defendants)

28. Paragraphs 1 through 27 are incorporated herein by reference as if fully set forth hereat.

29. MERS, ReconTrust and US Bank have wrongfully foreclosed on the Debtor's Residence by purportedly exercising a power of sale and recording the NOD, NOS and Trustee's Deed without legal standing to do so.

30. US Bank has commenced an eviction action against the Debtor, Los Angeles Superior Court case number 08R00036, seeking to evict the Debtor from his Residence based on an invalid Foreclosure Sale. Debtor shall remove the eviction action to this Court and request the consolidation thereof with this adversary proceeding.

31. The Debtor has suffered damages directly and proximately caused by the Defendants' wrongful conduct in an amount according to proof.

32. Debtor is entitled to compensatory damages for all foreseeable costs, expenses, inconvenience and delay incurred in addressing the wrongful foreclosure.

33. Debtor is entitled to exemplary and punitive damages against all Defendants in an amount sufficient to punish and deter Defendants from taking wrongful actions seeking to dispossess consumers from their homes under false and fraudulent pretenses.

**FOURTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(Against ReconTrust Only)**

34. Paragraphs 1 through 33 are incorporated herein by reference as if fully set forth hereat.

35. As foreclosure trustee, ReconTrust has a fiduciary duty to all parties to the DOT to exercise its powers in a manner that strictly complies with California foreclosure law.

36. By engaging in a wrongful foreclosure, ReconTrust has breached its fiduciary duty to the Debtor.

37. ReconTrust's breach of fiduciary duty has directly and proximately caused the Debtor to suffer damages in an amount according to proof.

38.  Debtor is entitled to compensatory damages for all foreseeable costs, expenses, inconvenience and delay incurred due to ReconTrust's breach of fiduciary duty.

39. Debtor is entitled to exemplary and punitive damages against ReconTrust in an amount sufficient to punish and deter ReconTrust from engaging in breach of fiduciary duty resulting in the wrongful foreclosure of consumers' residences.

**FIFTH CAUSE OF ACTION**

**ATTORNEY'S FEES**

**(Against all Defendants)**

40. Paragraphs 1 through 39 are incorporated herein by reference as if fully set forth hereat.

41. Upon a determination that Debtor is the prevailing party in this action, Debtor requests an award of all attorney's fees incurred in prosecuting this action.

1

      **WHEREFORE**, the Debtor prays for judgment against Defendants as follows:

2

    1.    For a declaration that the NOD, NOS and Foreclosure Sale are invalid under

3

        California law and the Trustee's Deed is void *ab initio* and of no force and effect;

4

    2.    For a judgment quieting title to the Residence in the Debtor as of the Foreclosure

5

        Sale date;

6

    3.    For damages, both compensatory and punitive, in an amount according to proof;

7

    4.    For attorney's fees and costs of suit; and

8

    5.    For such other relief as the Court deems just and proper.

9

Dated: November 12, 2008                    **Lewis R. Landau**
                                            **Attorney at Law**

10

11

                                        By:*/s/ Lewis R. Landau*

12

                                        Lewis R. Landau
                                        Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

OCTOBER 27, 2005          SANTA ANA          CALIFORNIA
[Date]                    [City]             [State]

29711 HARVESTER ROAD, MALIBU, CA 90265
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,910,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed    115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is COUNTRYWIDE HOME LOANS, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    2.500 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first          day of DECEMBER, 2005          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 40/100          percentage point(s)    3.400 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than    9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first          day of each month beginning on DECEMBER 01, 2005    . I will make these payments every month until I have paid all the Principal and interest and any



other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   NOVEMBER 01, 2035   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 7,546.81   , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the   first   day of DECEMBER, 2006   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN   percent ( 115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
(i)  Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
(ii)  Fully Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.
(iii)  15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.  NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.



## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_____
ALAN   BARON                                    - Borrower

_____
                                                - Borrower

_____
                                                - Borrower

_____
                                                - Borrower

# EXHIBIT 2



**This page is part of your document - DO NOT DISCARD**



05 2737554

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
**11/14/05 AT 08:00am**

# TITLE(S) :



L E A D    S H E E T

| FEE | | D.T.T. |
|---|---|---|
| FEE $ 13 - J | | |
| DAF $ 2 | | |
| C-20    23 | | |



| CODE 20 | | |
|---|---|---|
| CODE 19 | | |
| CODE 9 | | |

NOTIFICATION SENT $4

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**       **Number of AIN's Shown**



**THIS FORM IS NOT TO BE DUPLICATED**



# LANDSAFE TITLE

Recording Requested By:
G. HUNT

**05 2737554**

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
TAMMERA NORMAN

*03362653-19*
*4469-028-001*

[Space Above This Line For Recording Data]

29007324                    00011490936210005
[Escrow/Closing #]                [Doc ID #]

# DEED OF TRUST

MIN 1000157-0005855488-8

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  OCTOBER 27, 2005      , together with all Riders to this document.

**(B) "Borrower"** is

ALAN BARON, AN UNMARRIED MAN

**CALIFORNIA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**

Page 1 of 16

Initials:



-6A(CA) (0207)    **CHL (09/02)(d)**    VMP MORTGAGE FORMS - (800)521-7291
CONV/VA

Form 3005  1/01



*23991*                    *114909362000001006A*

DOC ID #: 00011490936210005

Borrower's address is
29711 HARVESTER ROAD, MALIBU, CA 90265
Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada, Calabasas, CA 91302-1613
**(D) "Trustee"** is
RECONTRUST COMPANY, N.A.
255 W HILLCREST DRIVE, MSN: TO-02, THOUSAND OAKS, CA 91360
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated OCTOBER 27, 2005 . The Note states that Borrower owes Lender
ONE MILLION NINE HUNDRED TEN THOUSAND and 00/100

Dollars (U.S. $ 1,910,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 01, 2035 .
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

Initials: ____

DOC ID #: 00011490936210005

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY of LOS ANGELES :
[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 4469-028-001                     which currently has the address of
29711 HARVESTER ROAD, MALIBU                ,
[Street/City]

California    90265    ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

Initials: _____

-6A(CA) (0207)        CHL (09/02)        Page 3 of 16        Form 3005 1/01

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

DOC ID #: 0001149093621000S

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

05 2737554

7

DOC ID #: 0001149093621 0005

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

Initials: _____

-6A(CA) (0207)     CHL (09/02)          Page 6 of 16                     Form 3005 1/01

05 2737554



DOC ID #: 00011490936210005

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

05 2737554

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

Initials:

05 2737554

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

05 2737554

23

DOC ID #: 00011490936210005

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

05 2737554

24

*12*

DOC ID #: 00011490936210005

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

Initials:

-6A(CA) (0207)   CHL (09/02)   Page 11 of 16   Form 3005 1/01

05 2737554

25

DOC ID #: 0001149093621005

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

05 2737554 26

14

DOC ID #: 00011490936210005

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

Initials:

DOC ID #: 00011490936210005

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials:

-6A(CA) (0207)     CHL (09/02)          Page 14 of 16                    Form 3005 1/01

05  2737554

*16*

DOC ID #: 00011490936210005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                    _____ (Seal)
ALAN BARON                                                                      -Borrower

_____                    _____ (Seal)
                                                                                         -Borrower

                                                        _____ (Seal)
                                                                                         -Borrower

                                                        _____ (Seal)
                                                                                         -Borrower

05 2737554

17

DOC ID #: 00011490936210005

State of California
County of Los Angeles

On October 27, 2005 before me, SHIRLEY A. NELSON, NOTARY PUBLIC } ss.

personally appeared

Alan Baron , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

SHIRLEY A. NELSON
Commission # 1490917
Notary Public - California
Orange County
My Comm. Expires May 22, 2008

05 2737554     30

# ADJUSTABLE RATE RIDER

### (PayOption MTA Twelve Month Average Index - Payment Caps)

29007324                00011490936210005
[Escrow/Closing #]          [Doc ID #]

THIS ADJUSTABLE RATE RIDER is made this TWENTY-SEVENTH day of
OCTOBER, 2005      , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
COUNTRYWIDE HOME LOANS, INC.

("Lender") of the same date and covering the property described in the Security Instrument and
located at:

29711 HARVESTER ROAD
MALIBU, CA 90265
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE
MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY
PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD
BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE
MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

• **PayOption MTA ARM Rider**
**1E310-XX (12/04)(d)**                Page 1 of 6





05 2737554

19

DOC ID #: 0001149093621

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 2.500 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of DECEMBER, 2005 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Beginning with the first Interst Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 40/100 percentage point(s) ( 3.400 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the FIRST day of each month beginning on December, 2005 . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on NOVEMBER 01, 2035 , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date." :

• **PayOption MTA ARM Rider**
**1E310-XX (12/04)** Page 2 of 6

11/14/05

DOC ID #: 0001149093621005

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of
U.S. $ 7,546.81                              , unless adjusted under Section 3 (F).

**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the
first          day of DECEMBER, 2006          , and on that day every 12th
month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also
will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.
The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment
which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If
the Minimum Payment is not sufficient to cover the amount of the interest due then negative
amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment
Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of
the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe
at the Payment Change Date in full on the maturity date in substantially equal payments at the interest
rate effective during the month preceding the Payment Change Date. The result of this calculation is
called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment
effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly
payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the
Principal and interest payment and does not apply to any escrow payments Lender may require under
the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my
Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or
3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the
Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly
payment.

• **PayOption MTA ARM Rider**
**1E310-XX (12/04)**          Page 3 of 6

05 2737554

DOC ID #: 0001490936210005

**(E) Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN percent ( 115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options;

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

● **PayOption MTA ARM Rider**
**1E310-XX (12/04)**                    Page 4 of 6  .

*22*

DOC ID #: 0001149093621005

These Payment Options are only applicable if they are greater than the Minimum Payment.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest In Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by

**'05  2737554**

35



DOC ID #: 00011490936210005

this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____                    _____
ALAN BARON                                                         -Borrower

_____                    _____
                                                                   -Borrower

_____                    _____
                                                                   -Borrower

_____                    _____
                                                                   -Borrower

● **PayOption MTA ARM Rider**
**1E310-XX (12/04)**                      Page 6 of 6

05 2737554

36

EXHIBIT "A"

THAT PORTION OF THE RANCHO TOPANGA MALIBU SEQUIT, IN THE CITY
OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS
CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1, PAGE
407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER
OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER LINE OF EASEMENT NO. 2
(HARVESTER ROAD), DESCRIBED IN THE DECLARATION OF EASEMENTS
RECORDED JANUARY 16, 1947 IN BOOK 24092, PAGE 408 OF OFFICIAL
RECORDS, SAID POINT OF BEGINNING BEING NORTH 89°57'29" WEST
258.00 FEET FROM THE EASTERLY EXTREMITY OF THE CENTER LINE
COURSE DESCRIBED IN SAID EASEMENTS AS NORTH 89°57'29" WEST
731.49 FEET; THENCE FOLLOWING THE CENTER LINE OF SAID EASEMENT
NORTH 89°57'29" WEST 100.00 FEET; THENCE NORTH 00°02'31" EAST
576.61 FEET; THENCE SOUTH 84°59'09" EAST 100.375 FEET; THENCE
SOUTH 00°02'31:" WEST 567.91 FEET TO THE POINT OF BEGINNING.

SAID LAND IS ALSO SHOWN AS A PORTION OF PARCEL 17 IN BLOCK 2 ON
A RECORD OF SURVEY FILED IN BOOK 58, PAGE 29 OF RECORDS OF
SURVEY, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL NO.: 4469-028-001

# EXHIBIT 3



**This page is part of your document - DO NOT DISCARD**





**20070434290**

Pages.
**002**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County ,
California

**02/28/07 AT 08:00AM**

| | |
|---|---|
| Fees | |
| Taxes | **$12.00** |
| Other | **$0.00** |
| Paid | $0.00 |
| | **$12.00** |

**TitleCompany**

## TITLE(S) :



L E A D    S H E E T

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**      **Number of AIN's Shown**

E 490279    **THIS FORM IS NOT TO BE DUPLICATED**



# LANDSAFE TITLE

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

RECONTRUST COMPANY, N.A.
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA 93063

Attn:  Miriam J. Paez
TS No.  07-07146
Doc ID #0001149093622005N
Title Order No. 07-8-025480
Investor/Insurer No. 114909362



02/28/07

20070434290

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE

## IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,

and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until three months from the date this notice of default may be recorded ( which date of recordation appears on this notice).

This amount is  $26,412.24, as of 02/27/2007 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations ( such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

|Page 1 of 2 |

*Form nod (09/01)*

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
**C/O Countrywide Home Loans, Inc**
**400 COUNTRYWIDE WAY SV-35**
**SIMI VALLEY, CA 93065**
**FORECLOSURE DEPARTMENT (800) 669-6650**

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure. Remember,

# YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN THAT: RECONTRUST COMPANY, N.A. is the duly appointed Trustee under a Deed of Trust dated 10/27/2005, executed by ALAN BARON, AN UNMARRIED MAN as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. as beneficiary recorded 11/14/2005, as Instrument No. 05 2737554 (or Book , Page ) of Official Records in the Office of the County Recorder of Los Angeles County, California.

Said obligation including ONE NOTE FOR THE ORIGINAL sum of $ 1,910,000.00.

That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of : FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL AND INTEREST WHICH BECAME DUE ON 12/01/2006 AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL AND INTEREST, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEYS' FEES. IN ADDITION, THE ENTIRE PRINCIPAL AMOUNT WILL BECOME DUE ON 11/01/2035 AS A RESULT OF THE MATURITY OF THE OBLIGATION ON THAT DATE.

That by reason thereof, the present beneficiary under such deed of trust has executed and delivered to said duly appointed Trustee a written Declaration of Default and Demand for sale, and has deposited with said duly appointed Trustee such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: February 27, 2007
RECONTRUST COMPANY, N.A., as Trustee
By LandSafe Title Corporation, as Attorney in Fact

By _____

ANI EYVAZ

[Page 2 of 2 ]

*Form nod (09/01)*

# EXHIBIT 4



**This page is part of your document - DO NOT DISCARD**



**20080361844**   Pages: 002

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

Fee:   9.00
Tax:   0.00
Other: 0.00

**03/03/08 AT 08:00AM**

Total: 9.00

**Title Company**

## TITLE(S) :



L E A D    S H E E T

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.       **Number of AIN's Shown**

‐       ‐      .

   E248671      **THIS FORM IS NOT TO BE DUPLICATED**

43

·· LANDSAFE TITLE

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA 93063

**WHEN RECORDED MAIL TO:**
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA 93063

TS No. 07-07146
Title Order No. 07-8-025480

03/03/08

**20080361844**

APN No. 4469-028-001

## NOTICE OF TRUSTEE'S SALE

# YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 10/27/2005. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

Notice is hereby given that RECONTRUST COMPANY, N.A., as duly appointed trustee pursuant to the Deed of Trust executed by ALAN BARON, AN UNMARRIED MAN, dated 10/27/2005 and recorded 11/14/2005, as Instrument No. 05 2737554, in Book , Page , ), of Official Records in the office of the County Recorder of LOS ANGELES County, State of California, will sell on 03/19/2008 at 10:30 AM, AT THE WEST SIDE OF THE LOS ANGELES COUNTY COURTHOUSE, DIRECTLY FACING NORWALK BLVD., 12720 NORWALK BLVD., NORWALK, CA

at public auction, to the highest bidder for cash or check as described below, payable in full at time of sale, all right, title, and interest conveyed to and now held by it under said Deed of Trust, in the property situated in said County and State and as more fully described in the above referenced Deed of Trust. The street address and other common designation, if any, of the real property described above is purported to be: 29711 HARVESTER ROAD, MALIBU, CA 90265. The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

The total amount of the unpaid balance with interest thereon of the obligation secured by the property to be sold plus reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $2,124,694.00. It is possible that at the time of sale the opening bid may be less than the total indebtedness due.

In addition to cash, the Trustee will accept cashier's checks drawn on a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state.

Said sale will be made, in an "AS IS" condition, but without covenant or warranty, express or implied, regarding title, possession or encumbrances, to satisfy the indebtedness secured by said Deed of Trust, advances thereunder, with interest as provided, and the unpaid principal of the Note secured by said Deed of Trust with interest thereon as provided in said Note, plus fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust.

DATED: ▮▮▮▮▮▮ **FEB 2 8 2008**
RECONTRUST COMPANY, N.A.
1757 TAPO CANYON ROAD, SVW-88
SIMI VALLEY, CA 93063
Phone: (800) 281-8219 , Sale Information (626) 927-4399

By: _____
Kristin Warner,  Team Member

RECONTRUST COMPANY, N.A. is a debt collector attempting to collect a debt. Any information obtained will be used for that purpose.

*Form 44os (07/01)*

# EXHIBIT 5



**This page is part of your document - DO NOT DISCARD**





**20080655594**

**Pages: 002**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**04/16/08 AT 08:00AM**

Fee: 9.00

Tax: 0.00

Other: 0.00

Total: 9.00

**Title Company**

# TITLE(S) :





L E A D     S H E E T

**Assessor's Identification Number (AIN)**
**To be completed by Examiner OR Title Company in black ink.**     **Number of AIN's Shown**



E 42785J     **THIS FORM IS NOT TO BE DUPLICATED**



**LANDSAFE TITLE**

RECORDING REQUESTED BY:

RECONTRUST COMPANY, N.A.

**AND WHEN RECORDED MAIL DOCUMENT**

**AND TAX STATEMENTS TO:**

RECONTRUST COMPANY, N.A.
1757 TAPO CANYON ROAD, SVW-88SIMI
VALLEY, CA  93063



04/16/08

**20080655594**

$\mathcal{V}$

TS No. 07-07146

7-07546

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFER TO:

**U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF HARBORVIEW 2005-16 TRUST FUND**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 10/27/2005, EXECUTED BY: ALAN BARON, AN UNMARRIED MAN,TRUSTOR: TO RECONTRUST COMPANY, N.A., TRUSTEE AND RECORDED AS INSTRUMENT NO. 05 2737554 ON 11/14/2005, OF OFFICIAL RECORDS IN THE COUNTY RECORDER'S OFFICE OF LOS ANGELES  COUNTY, IN THE STATE OF CALIFORNIA.

DESCRIBING THE LAND THEREIN:  AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

TOGETHER WITH THE NOTE OR NOTES THEREIN DESCRIBED OR REFERRED TO, THE MONEY DUE AND TO BECOME DUE THEREON WITH INTEREST, AND ALL RIGHTS ACCRUED OR TO ACCRUE UNDER SAID DEED OF TRUST/MORTGAGE.

APR 1 0 2008

DATED: February 27, 2007          **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**

State of:  **CALIFORNIA**          )     BY: _____

County of:  **VENTURA**          )          Renee Friedman, Assistant Secretary

On April 11, 2008 before me,  **Angeles Medina** _____, notary public, personally appeared
Renee Friedman _____, who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Signature _Angeles M_____  (Seal)

**Angeles Medina**



ANGELES MEDINA
Commission # 1786299
Notary Public - California
Ventura County
My Comm. Expires Dec 23, 2011

47

*Form asgnmnt (07/01)*

# EXHIBIT 6

▲ **This page is part of your document - DO NOT DISCARD** ▲ 



**20080655595**  Pages:
004

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**04/16/08 AT 08:00AM**

Fee:  13.00
Tax:  0.00
Other: 0.00
Total: 13.00

**Title Company**

**TITLE(S) :** _____

▲ ▲



L E A D     S H E E T

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.     **Number of AIN's Shown**

—  —

▲  E327862  **THIS FORM IS NOT TO BE DUPLICATED** ▲ 

**LANDSAFE TITLE**

RECORDING REQUESTED BY:
  RECONTRUST COMPANY, N.A.
AND WHEN RECORDED MAIL TO:

**RECONTRUST COMPANY, N.A.**
**1757 TAPO CANYON ROAD, SVW-88**
**SIMI VALLEY, CA 93063**

Forward Tax Statements to Address listed above



04/18/08

**20080655595**

_____
SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No.  07-07146

Title Order No.  07-8-025480

# TRUSTEE'S DEED UPON SALE

APN#     4469-028-001            TRANSFER TAX: $ _____

The Grantee herein  was the beneficiary
The amount of the unpaid debt was $ 2,142,842.23
The amount paid by the Grantee was $ 2,040,000.00
The property is in the city of MALIBU, County of LOS ANGELES

RECONTRUST COMPANY, N.A., as the duly appointed Trustee (or successor Trustee or substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without covenant or warranty to:

   U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF
HARBORVIEW 2005-16 TRUST FUND

herein called Grantee, the following described real property situated in LOS ANGELES County, California:

SEE ATTACHED LEGAL DESCRIPTION    **See Exhibit "A" Attached**

This conveyance is made pursuant to the powers conferred upon Trustee by the Deed of Trust executed by ALAN BARON, AN UNMARRIED MAN, as Trustor, recorded on 11/14/2005, Instrument Number 05 2737554 ( or Book , Page ) Official Records in the Office of the County Recorder of LOS ANGELES County.

All requirements of law regarding the recording and mailing of copies of the Notice of Default and Election to Sell, and the recording, mailing, posting, and publication of the Notice of Trustee's Sale have been complied with.

TS No. 07-07146

Title Order No. 07-8-025480

Trustee, in compliance with said Notice of Trustee's Sale and in exercise of its power under said Deed of Trust sold said real property at public auction on 04/04/2008. Grantee, being highest bidder at said sale became the purchaser of said property for the amount bid, which amount was $ 2,040,000.00.

DATE:    April 04, 2008                    RECONTRUST COMPANY, N.A.

BY: _____

Renee Friedman, Assistant Secretary

State of California                    }

County of Ventura                    }

On _April 11, 2008_ before me, Angeles Medina, notary public, personally appeared Renee Friedman, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Angeles Medina

ANGELES MEDINA
Commission # 1786299
Notary Public - California
Ventura County
My Comm. Expires Dec 23, 2011

*Form trsteedeed (01/02)*

## EXHIBIT "A"

THE LAND REFERRED TO IN THIS GUARANTEE IS SITUATED IN THE **STATE OF CALIFORNIA, CITY OF MALIBU, COUNTY OF LOS ANGELES** AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF THE RANCHO TOPANGA MALIBU SEQUIT, IN THE CITY OF MALIBU, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1, PAGE 407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER LINE OF EASEMENT NO. 2 (HARVESTER ROAD), DESCRIBED IN THE DECLARATION OF EASEMENTS RECORDED JANUARY 16, 1947 IN BOOK 24092, PAGE 408 OF OFFICIAL RECORDS, SAID POINT OF BEGINNING BEING NORTH 89°57'29" WEST 258.00 FEET FROM THE EASTERLY EXTREMITY OF THE CENTER LINE COURSE DESCRIBED IN SAID EASEMENTS AS NORTH 89°57'29" WEST 731.49 FEET; THENCE FOLLOWING THE CENTER LINE OF SAID EASEMENT NORTH 89°57'29" WEST 100.00 FEET; THENCE NORTH 00°02'31" EAST 576.61 FEET; THENCE SOUTH 84°59'09" EAST 100.375 FEET; THENCE SOUTH 00°02'31:" WEST 567.91 FEET TO THE POINT OF BEGINNING.

SAID LAND IS ALSO SHOWN AS A PORTION OF PARCEL 17 IN BLOCK 2 ON A RECORD OF SURVEY FILED IN BOOK 58, PAGE 29 OF RECORDS OF SURVEY, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.